## MILLER v. CONSOLIDATED LAKE SUPERIOR CO. et al.

(Circuit Court, D. Connecticut. August 2, 1901.)

### No. 1,066.

CORPORATIONS—SUIT BY STOCKHOLDER—PRELIMINARY INJUNCTION.

The case made by a complainant by his bill and affidavits showed that he was a stockholder in the corporation defendant, of which the other defendants were the directors; that it became necessary to the successful prosecution of certain of the business of the corporation that it should construct a railroad and acquire and operate a line of steamers to transport the products of an iron mine which it had developed, but that it was without authority to do such things under its charter, which could not be amended for some two years; that thereupon the individual defendants organized a new corporation, having such authority, which obtained right of way for a railroad, together with a land grant from the Canadian government, purchased steamers, and constructed a portion of the railroad; that such defendants themselves took substantially all the stock in the new company, and, after the subsequent amendment of the charter of defendant company, conspired together, and, by reason of their controlling interest and influence therein, compelled such company to purchase the properties and rights of the new company at an exorbitant price, for their own profit. *Held* that, in the absence of a clear showing by defendants of sufficient reasons justifying their actions, complainant was entitled to a preliminary injunction, restraining the consummation of the purchase until the trial of the cause on the merits.

In Equity. On motion for preliminary injunction.

White & Otheman, for complainant.

J. S. Freeman and Lewis Sperry, for defendants.

SHIPMAN, Circuit Judge. The Consolidated Lake Superior Company, hereinafter called the Consolidated Company, is a corporation which was incorporated by the legislature of the state of Connecticut in 1897, under the name of the American Lake Superior Power Company. It received its present name by decree of the proper state court of Connecticut in 1898. By amendment of the charter, approved May 17, 1899, it was authorized to engage in manufacturing, milling, and smelting, to furnish light and power, to purchase and hold the stock and securities of other corporations formed for similar purposes, and with power, upon the vote of two-thirds of its stockholders, to exchange its stock for stock of other companies. Until May 16, 1901, its capital stock was "twenty million ($20,000,000) dollars, divided into four hundred thousand (400,000) shares of a par value of fifty ($50) dollars each, of which one hundred and twenty thousand (120,000) shares were preferred to the extent of seven (7)

per cent. of dividends, and two hundred and eighty thousand (280,000) shares were common." The first business of this corporation was to cause the purchase of an existing canal and water power at Sault Ste. Marie, in Canada. It then received, through a subsidiary company, the profit and advantage of a valuable concession from the provincial government of Ontario to cut timber from 10,000 square miles of government land, and established a wood pulp mill, which became, by improved machinery, a dry wood pulp mill of large extent. Subsequently, a machine shop and foundry, a sulphite pulp mill, a water and light company, a nickel steel plant, a nickel mine near Sudbury, Canada, and a hematite iron mine, 110 miles northwest of Sault Ste. Marie, called the "Helen" mine, and a water power canal on the Michigan side of the lake were added. These various enterprises, except the machine and foundry, are immediately managed by separate subsidiary local companies, the stock of which is owned by the Consolidated Company, with the exception of enough to preserve corporate organization. The subsidiary companies are called the Lake Superior Power Company (which owns the Hydraulic Power Works, the ferro-nickel plant, and the nickel and iron mines), the Sault Ste. Marie Pulp & Paper Company (of which the iron works are a department), the Tagoma Water & Light Company, and the Michigan Lake Superior Power Company; but all are a part of the system of development of the Consolidated Company. These various enterprises have apparently been very successful. The Consolidated Company has paid dividends of 7 per cent. on the preferred stock and 4 per cent. on the common stock, and prior to May, 1901, the preferred stock was listed on the Philadelphia Stock Exchange and sold at $49 per share, of the par value of $50, and the common stock was sold at $38 per share of the same par value. In 1899, and after the amendment of the charter of that year, it became important and necessary for the complete development of the Consolidated Company's business that vessels for the transportation of ore on Lake Superior should be purchased, and that a railroad should be built northwesterly from Sault Ste. Marie for the transportation of timber, and from the Helen mine to Lake Superior. A charter was granted by the parliament of the Dominion of Canada in August, 1899, for the construction of this road of about 200 miles from Sault Ste. Marie to a point on the Canadian Pacific Railway, and from that point to the Helen mine, and thence to Michipicoton, a harbor on Lake Superior, to the Algoma Central Railway Company, which was also authorized to own vessels. A land grant of 1,500,000 acres of forest land was donated to the Algoma Commercial Company, Limited, which was organized under the Ontario companies' act, for the development of this grant, known to contain timber, and said to contain iron mines of great value. Ships were purchased in the name of the railway company for the transportation of ore on the lakes. It was necessary that a corporation in this country should furnish the capital and should own the stock of these two Canadian corporations, each of $10,000,000, and for that purpose the Ontario Lake Superior Company, hereinafter called the Ontario Company, was organized under the joint-stock act of Connecticut on January

110 F.—31

9, 1900, to carry on a general commercial and manufacturing business, and to own and operate railroad and steamship lines, with a capital of $20,000,000, divided, as was the stock of the Consolidated Company, into "four hundred thousand (400,000) shares of a par value of fifty ($50) dollars each, of which one hundred and twenty thousand (120,000) shares were preferred to the extent of seven (7) per cent. of dividends, and two hundred and eighty thousand (280,000) shares were common." The stock of the two subsidiary Canadian corporations is owned by the Ontario Company, with the exception of so much stock as is necessarily owned by individuals for the purpose of corporate organization. The complainant's exhibits are relied upon to show that the individual defendants are and have continuously been the officers and directors of the Consolidated Company, and are and have continuously been, excepting John Pitcairn, the corresponding officers and directors of the Ontario Company, and that the Ontario Company was formed by the individual defendants, with the exception of Pitcairn, for the purpose of having the benefit of the ownership of these railroads, ships, and franchises, deemed necessary by its promoters for the development and improvement of the property of the Consolidated Company, and nominally belonging to the two subsidiary companies, and with the intent of a joinder and merger of the Connecticut companies when the two boards of directors should deem that the proper time had arrived. The public addresses of Mr. Clergue, the general manager of the Consolidated Company, are relied upon as adequate to show that the new enterprises were or were to be those of the Consolidated Company. The entire stock of the Ontario Company was subscribed by some of the individual defendants. E. V. Douglas, as trustee, subscribed for 119,200 shares of preferred, and for 280,000 shares of common, stock. The stock was then offered to the public in a prospectus, which, in detail, described the abundant future profits which the company was to receive from its business. A large part of this business was to come from the Consolidated Company.

On May 3, 1901, the Consolidated Company obtained from the legislature of Connecticut an amendment of its charter, whereby power was given to increase its capital stock, and authorizing it to acquire and hold the stock of any other corporation engaged in operating railroad or steamship lines, and thereafter called a meeting of its stockholders on May 16, 1901, to accept this amendment, to increase its capital stock, and, among other things, to authorize the purchase and acquirement of the capital stock and property of the Ontario Company. It is estimated that not more than $4,500,000 had been expended at this time by the subsidiary companies through which the Ontario Company either expends money or beneficially acquires property. In May, 1901, the treasurer of the two Connecticut companies, in reply to the complainant's letter of inquiry, said that 12 miles of the railway had been completed, which were between Michipicoton Harbor and the Helen mine, 40 miles of the main line from Sault Ste. Marie had been completed, and terminal docks at Michipicoton had been constructed, and four large, steel, ore-carrying steamers, besides other lake equipment, were owned. The fol-

lowing plan for the consolidation of the two Connecticut corporations, recommended by the directors of the Consolidated Company, was published for the information of the stockholders of each corporation on May 6, 1901, and was adopted by the stockholders of the Consolidated Company at their meeting on May 16th.

### "Exhibit A.

"Plan: (1) The capital stock of the Consolidated Lake Superior Company to be increased, by resolution of the stockholders, so that the total capital stock shall be: Preferred, 7 per cent., noncumulative, $35,000.000; common, $82,000,000,—the par value of each share of stock to be changed from $50 to $100. (2) A stock dividend to be declared on the preferred and common stock of the Consolidated Lake Superior Company, based on a reappraisal of assets, particularly of the Helen iron mine, to the extent of 25 per cent. on preferred stock, payable in preferred stock, making each $100 of present holdings $125 in preferred stock, 100 per cent. on common stock, payable in common stock, making each $100 of present holdings $200 in common stock. After the declaration of the above stock dividends, and upon the surrender of the present outstanding preferred and common stock certificates of the par value of fifty dollars per share, new certificates of the par value of one hundred dollars will be issued for an equal amount in value. At the same time, orders will be given for the preferred and common stock dividends, for which certificates will be issued after June 1, 1901; the cash dividend on the present holdings of preferred stock to be paid June 15, 1901, to stockholders of record May 31, 1901, and quarterly thereafter on the entire amount. (3) The stock of the Ontario Lake Superior Company to be acquired by giving in exchange $125 par value of the new issue of Consolidated preferred stock for $100 par value of Ontario preferred stock, and $200 par value of the new issue of Consolidated common stock for $100 par value of Ontario common stock; dividend on preferred Ontario stock to be adjusted as of June 1, 1901, the date on which the dividend on the stock of the Consolidated Company received in exchange begins to accrue. (4) After providing for the stock dividends above referred to, and for acquiring the stock of the Ontario Lake Superior Company, the balance of the increased issue of preferred and common stock of the Consolidated Lake Superior Company will be used for the enlargement of the steel plant now in course of construction at Sault Ste. Marie, Ontario, to the capacity of twenty-five hundred (2,500) tons of steel daily, and for other subsidiary undertakings collateral thereto."

In the circular of May 6th it is said that the acquiescence of more than two-thirds of the stockholders of each company had already been formally secured. It is not difficult to understand the power of the influence that the recommendation of the directors of each company would carry. Steps were taken by the Consolidated Company for the immediate execution of this plan. At this meeting four stockholders and the complainant were present, but the recommended plan of consolidation was adopted, and was authorized by the vote of more than 80 per cent. of the stockholders, who had sent their proxies to the president. The complainant did not vote, but verbally protested against the proposed action, and has brought the bill in equity in this case to prevent the execution of the plan. On May 16th he owned, and still owns, 10 shares of preferred stock, bought in May, 1899, and 515 shares of common stock, bought on or before March 27, 1900. The whole number of stockholders of the Consolidated Company on May 16, 1901, was 820. The whole number of stockholders of the Ontario Company at said date was, approximately, 500. The directors of the Consolidated Company owned at said

date less than one-third of the stock of said company. The present motion is for a preliminary injunction to prevent the purchase of the Ontario stock until final hearing.

Inasmuch as it is not claimed that the action of the Consolidated Company or of its directors was ultra vires, the ground for seeking the interference of a court of equity is contained, in substance, in the eighth paragraph of the bill, which avers that the individual defendants, being the "directors of the Consolidated Lake Superior Company, and well knowing that the additions and extensions specified in paragraph seventh hereof were necessary to the Consolidated Lake Superior Company, together entered into a combination and conspiracy to acquire in their own behalf the rights and properties specified in paragraph seventh hereof, and by means of their controlling interest in the Consolidated Lake Superior Company to compel said last mentioned company to purchase such rights and properties at an excessive valuation, in fraud of the rights of other stockholders, and in violation of their duty as directors of the Consolidated Lake Superior Company." In brief, the bill is founded upon transactions alleged to have the characteristics of such fraud, completed or imminent, by the directors of the Consolidated Company, "either among themselves, or with some other party, or with shareholders, as will result in serious injury to the company or the other shareholders." The asserted facts upon which the conclusion of fraud is based are that the directors of the Consolidated Company, knowing that additional timber and mining lands, railroads, and ships were necessary to the development of the company, procured the necessary franchises and expended the necessary moneys for the immediate and partial enjoyment of them, through the intervention of the Ontario Company, of which they took the entire capital stock, with the intention of selling those properties to the Consolidated Company, and inducing it to buy them at a greatly enhanced and exhorbitant price. It is evident that in the latter part of 1899 the Consolidated Company had been a very successful undertaking, and had developed different and not closely related enterprises with great apparent profit. Vessels for the transportation of ore and railroads for the profitable transportation of the products of its mines, its factories, and its forests were known by the managers to be needed. A charter for a railroad would also, probably, secure an extensive land grant, in pursuance of the known policy of the Canadian government. The strength of the complainant's case is in the question: Inasmuch as the intent of these acquisitions was their subsequent purchase by the Consolidated Company, why were they not secured by its directors, so as to be for its exclusive benefit, and to be ready for purchase by it at a reasonable price, instead of being secured by them for the benefit and great profit of another corporation, which they had formed for that purpose, and of which they were the promoters and originally the sole owners, and by whose plan and controlling recommendation these acquisitions were passed over to the Consolidated Company at an exorbitant price?

The defendants' affidavits do not state the affirmative reasons for the organization of the Ontario Company, but it is not difficult to

see that a new corporation was requisite for the purchase of ships and the construction of railroads. The capital stock of the Consolidated Company had been issued. Its charter did not permit the ownership of railroads or ships, or of the stock of other corporations established for the purpose of such ownership. The legislature did not meet until January, 1901, and until then the charter could not be amended. If these new enterprises were to be forthwith entered upon, such entry must be made by a new corporation, and the Ontario Company was formed under the joint-stock law of Connecticut, which must have been known by its promoters to be a temporary expedient. The question why a new corporation was organized for the benefit and profit of its promoters has not yet been answered. It was not presented as an outcome of the business of the Consolidated Company, which was to own it as soon as corporate power of ownership should be obtained, but as a corporation which was to be for the great benefit of its stockholders, and was presented to the public as one which had remarkable promise of profit. The business which was to create the profit must come almost exclusively from the business of the Consolidated Company, and the prospectus was so far attractive that the stock of the new company has now been scattered among 500 stockholders. In May, 1901, when the Consolidated Company's charter was last amended, the Algoma railroad was in operation from the Helen mine to Lake Superior, and a portion was in operation at the Sault Ste. Marie end. How much had been done towards the development of the land grant does not appear, but something must have been done, and it is said that mines of great value had been discovered. On the part of the Consolidated Company, its completed properties were paid for, except a bonded debt of $160,000 upon the Tagoma Water & Light Company, and were in successful operation. A new steel mill, which would turn out 600 tons of steel rails per day, was expected to be in operation on August 1st. In this state of affairs, the plan proposed by the directors of the Consolidated Company provided for the increase of its stock to $117,000,000, declared a dividend of 25 per cent. on the preferred stock and 100 per cent. on the common stock, acquired the stock of the Ontario Company by giving $125 par value of Consolidated preferred for $100 par value of Ontario preferred, and $200 par value of Consolidated common stock for $100 par value of Ontario common. The residue of the new stock, amounting to $46,000,000, is to be used for the development of the steel plant and other subsidiary purposes. This amount of stock delivered for the purchase of the uncompleted and undeveloped plant of the Ontario Company seems extravagant; but, if no element of fraud existed at the time of the organization of the Ontario Company, an improvident price, approved by more than two-thirds of the stockholders of the purchasing company, constitutes no reason for the interference of a court. If fraud existed at the inception of the Ontario Company, the exorbitance, if any existed, of the purchase price is a circumstance which emphasizes the fraud.

The complainant has made by his exhibits a case which demands a stay in the execution of the proposed plan until the defense of the

defendants has been given, for I am of opinion that their defense is yet to be made. Their affidavits are inadequate, and do not answer the complainant's case that a breach of trust led to the formation by the directors of the old company of a new corporation, to take franchises necessary to the Consolidated Company for the apparent exclusive benefit and profit of the new corporation.

If a temporary injunction is refused, and the plan which has been adopted shall be carried into effect, a final decree in favor of the complainant would be of little value. The motion of the complainant for a preliminary injunction against the execution by the Consolidated Company of the plan hereinbefore recited, or of any similar plan for the purchase of the stock and property of the Ontario Company, and against the sale to the Consolidated Company by the Ontario Company of its franchises and property until further order of the court, is granted.